UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

SUZANNE DEAN,

                                        Plaintiff,

        v.                                                      3:10-CV-1138
                                                                (NAM/ATB)
MICHAEL ASTRUE, Commissioner,

                                        Defendant.
_____

DAVID L. BROWN, ESQ., for Plaintiff
DENNIS J. CANNING, Special Asst. U.S. Attorney for Defendant

ANDREW T. BAXTER, U.S. Magistrate Judge

## REPORT-RECOMMENDATION

        This matter was referred to me for report and recommendation pursuant to 28

U.S.C. § 636(b) and Local Rule 72.3(d).  This case has proceeded in accordance with

General Order 18.

## I.    PROCEDURAL HISTORY

        Plaintiff filed[1] an application for disability insurance benefits on March 27,

2007, claiming disability beginning August 12, 1998.  (Administrative Transcript

("T.") at 91–95).  Plaintiff's applications were denied on July 10, 2007.  (T. 55–57).

Plaintiff then requested a hearing before an ALJ on August 6, 2009.  (T. 58).  Plaintiff

testified at the hearing conducted on August 6, 2009.  (T. 24–52).

_____

[1] In his decision, the Administrative Law Judge (ALJ) stated that plaintiff "protectively filed"
her application on March 14, 2007.  (T. 11).  When used in conjunction with an "application" for
benefits, the term "protective filing" indicates that a written statement, "such as a letter," has been
filed with the Social Security Administration, indicating the claimant's intent to file a claim for
benefits.  *See* 20 C.F.R. § 416.340.  There are various requirements for this written statement.  *Id.*  If a
proper statement is filed, the Social Security Administration will use the date of the written statement
as the filing date of the application even if the formal application is not filed until a future date.

In a decision dated September 23, 2009, the ALJ found that plaintiff was not disabled.  (T. 14–21).  The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied plaintiff's request for review on July 23, 2010.  (T. 1–3).

## II.   ISSUES IN CONTENTION

The plaintiff makes the following claims:

1.   The ALJ improperly applied the treating physician rule.  (Pl.'s Mem. at 7–10).

2.   The ALJ's residual functional capability ("RFC") assessment was not supported by substantial evidence.  (Pl.'s Mem. at 10–13).

3.   The ALJ was required to obtain the opinion of a vocational expert.  (Pl.'s Mem. at 13–15).

## III.   APPLICABLE LAW

### A.   Disability Standard

To be considered disabled, a plaintiff must establish that he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ."  42 U.S.C. § 1382c(a)(3)(A).  In addition, the plaintiff's

physical or mental impairment or impairments [must be] of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [she] lives, or whether a specific job vacancy exists for [her], or whether [she] would be hired if [she] applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. § 404.1520 and in 416.920 to evaluate disability insurance and SSI disability claims.

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If [she] is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits [her] physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider [her] disabled without considering vocational factors such as age, education, and work experience . . . . Assuming the claimant does not have listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, [she] has the residual functional capacity to perform [her] past work. Finally, if the claimant is unable to perform [her] past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see* 20 C.F.R. §§ 404.1520, 416.920. The plaintiff has the burden of establishing disability at the first four steps. *Id*. However, if the plaintiff establishes that her impairment prevents her from performing her past work, the burden then shifts to the Commissioner to prove the final step. *Id.*

**B.    Scope of Review**

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supported the decision. *Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992) (citing *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987)). A reviewing court may

not affirm an ALJ's decision if it reasonably doubts whether the proper legal standards were applied, even if the decision appears to be supported by substantial evidence. *Johnson*, 817 F.2d at 986. In addition, an ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision. *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984).

A court's factual review of the Commissioner's final decision is limited to the determination of whether there is substantial evidence in the record to support the decision. 42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991). "Substantial evidence has been defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988) (citations omitted). It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 197 U.S. 229 (1938)); *Williams*, 859 F.2d at 258.

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams*, 859 F.2d at 258. However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record contains substantial support for the ALJ's decision. *Id*. *See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

## IV.   MEDICAL EVIDENCE

### A.   Knee and Back Pain

Plaintiff began receiving treatment for left-knee pain in 1998, after she fell at work and hit her knee against a metal door.  (T. 137, 338).  Dr. John Brosnan, an orthopedic specialist, began treating plaintiff on November 18, 1998.  (T. 29, 227–338).  At the plaintiff's initial visit, x-rays of plaintiff's knee were taken which revealed nothing abnormal.  (T. 338).  An MRI test, performed on January 27, 1999, showed no meniscal tear and only minor effusion.  (T. 336, 338).  During the January 27, 1999 examination, Dr. Brosnan noted that the plaintiff complained her knee hurt when she walked or drove, and he prescribed physical therapy.  (T. 336).  On March 17, 1999, plaintiff informed Dr. Brosnan that the physical therapy was helping to decrease the pain in her knee.  (T. 335).  Dr. Brosnan diagnosed plaintiff with chondromalacia patella[2] and told the plaintiff she could return to work.  *Id*.

By April 1999, plaintiff had tried to resume her job, but she stopped working because her work required her to walk up and down stairs, causing her pain.  (T. 332).  Dr. Brosnan recommended that plaintiff receive vocational rehabilitation, or pursue a job in which she did not have to walk up and down stairs.  *Id*.  On February 15, 2000, plaintiff decided to undergo arthoscopic surgery.  (T. 327).  By May, Dr. Brosnan determined that plaintiff's knee was sufficiently healed that she could return to "sedentary type work." (T. 323).

---

[2] Chondromalacia patella is the softening and breakdown of the tissue (cartilage) that lines the underside of the kneecap.  *The Bantam Medical Dictionary* 83 (Elizabeth A. Martin & Barbara Guidos eds., rev. ed. 1990).

Plaintiff continued to complain of knee pain and did not return to work.  (T. 320–22).  Dr. Brosnan ordered a second MRI which revealed that plaintiff had only "trace" arthritic-type of activity in her left knee.  (T. 164, 319).  During 2001, plaintiff continued to complain of intermittent knee pain, while Dr. Brosnan continued to state that plaintiff could return to sedentary work.  (T. 317–18, 321).  Dr. Brosnan prescribed plaintiff a variety of anti-inflammatory and pain medications.  (T. 316, 318–19).

Plaintiff complained that the oral medications did not help relieve her knee pain, and she received pain medication injections beginning on September 19, 2003.  (T. 314).  Plaintiff informed Dr. Brosnan that the injections[3] provided only minor pain relief.  (T. 312).  Plaintiff was prescribed a course of physical therapy, but complained that the therapy caused her to have "popping" and soreness in her knee.  (T. 311).  In November 2003, Dr. Charles Reina examined plaintiff and commented that the range of motion in her left knee appeared to be better as she was leaving the office than it had been during her examination and that there might have been "an element of symptom magnification and overprotection."  (T. 143).  Dr. Brosnan took a second set of x-rays of plaintiff's knee on March 1, 2004, which showed no injury to her knee.  Id.  Dr. Brosnan also received a third set of MRI results in April of 2004, which revealed that plaintiff had "small effusion and some chondromalacia of the patella."  (T. 309).  Plaintiff then had a second arthoscopic surgery on her knee in July 2004.  (T. 189).  The surgeon determined plaintiff's medial compartment structures were

---

[3] Plaintiff received a series of three injections between September and October 2003.  (T. 312–14).

within normal limits, and her anterior and posterior cruciate ligaments were intact. *Id*. After the surgery, Dr. Brosnan advised plaintiff to complete a home exercise program and gave her samples of Mobic. (T. 307). In January 2005, plaintiff continued to complain of knee pain, so Dr. Brosnan obtained a third set of x-rays of plaintiff's knee and found them to be "within normal limits." (T. 306).

Dr. Gerald Coniglio also saw plaintiff in January 2005. (T. 158). Dr. Coniglio commented that the best treatment for plaintiff would be "to find a job and return to work as [it] has been scientifically and repeatedly demonstrated that a return to work would provide her with benefits of enhanced longevity as well as necessary exercise to rehabilitate her lower extremity in a productive fashion." (T. 158). Between March and April of 2005, plaintiff was given a series of five Hyalgan injections. (T. 304–05). She indicated that the Hyalgan injections helped her knee. (T. 303). Dr. Coniglio examined plaintiff again in June 2005 and commented that plaintiff's "subjective symptoms greatly outweighed her objective findings," and there were "no objective findings . . . that would support a level of disability to the left knee." (T. 148, 151).

Dr. Brosnan subsequently diagnosed her with degenerative arthritis in October 2005, but noted that plaintiff's pain was "on and off again." (T. 301–303). Dr. Irwin Rosenberg also saw plaintiff in October 2005, and indicated that plaintiff had only a 30% loss of use of her left leg and walked with only a slight limp. (T. 161). However, by December 2005, plaintiff complained that the pain in her knee had increased, and Dr. Brosnan gave plaintiff a prescription for Ultram and recommended that she ice her

knee twice a day.  (T. 300).

Plaintiff was given a second round of Hyalgan injections in February 2006.  (T. 298).  This time, after the first several injections,[4] plaintiff asked to discontinue the treatment because the injections were "giving her discomfort."  (T. 297).  At this point, Dr. Brosnan's notes also indicated that plaintiff was complaining of increased lower back pain.  *Id*.  In April, plaintiff complained that the pain in her knee had begun to radiate up her leg and into her hip area.  (T. 296).  Dr. Brosnan ordered x-rays of plaintiff's hip which showed "no significant arthritis."  *Id.*  Notes from subsequent visits indicated that plaintiff's pain was only intermittent.  (T. 293, 295, 296).  Dr. Brosnan gave plaintiff a cortisone injection in her hip in June 2006, and stated that he thought plaintiff's lower back pain and hip pain were the result of her altered gait from her knee condition.  (T. 295).  Plaintiff told Dr. Brosnan that the cortisone injection did not improve her condition.  (T. 295).

For the remainder of 2006, plaintiff used Darvocet and Tylenol to manage the pain in her back and soreness in her knee.  (T. 292, 289).  On January 29, 2007, Dr. Brosnan obtained an MRI of plaintiff's lower back which showed "mild disc bulges" in her spine.  (T. 289).  Dr. Brosnan diagnosed plaintiff with degenerative arthritis of the left knee and degenerative disc disease.  *Id*.  Dr. Brosnan's notes from April 2007 indicated that plaintiff also tried Motrin for pain relief but it had been ineffective.  (T. 287).  Dr. Brosnan prescribed physical therapy for plaintiff, which she began in late

---

[4] It is unclear from the record whether the plaintiff received two or three injections in February 2006.  (*See* T. 298).

2007.[5]  (T. 284–285).

In October 2007, plaintiff began seeing Dr. Matthew Bennett for back pain.  (T. 270).  Dr. Bennett indicated he believed plaintiff had a left-sided sacroiliac joint dysfunction.  *Id*.  He noted that MRIs of plaintiff's back revealed some loss of disc height in plaintiff's back but no neural compression.  *Id*.  In March of 2008, Dr. Bennett reviewed x-rays of plaintiff's hip and pelvis which showed no evidence of fracture or dislocation.  *Id*.  In May, plaintiff told Dr. Brosnan and Dr. Bennett that she had fallen, aggravated her knee, and she was taking "some Advil."  (T. 280–81).  She also told Dr. Bennett that she had twisted her left ankle and that it hurt, but x-rays of her ankle were normal.  (T. 280).  Dr. Bennett's treatment notes indicated that plaintiff's ankle had a full range of motion and did not have any instability.  *Id*.

## B.    Other Ailments

In February 2004, plaintiff began seeing Dr. Hong Yu for her ongoing medical problems.  (T. 230).  Dr. Yu stated that plaintiff had acute asthma and recommended that she quit smoking and begin a diet and exercise plan.  *Id*.  Dr. Yu prescribed BuSpar to help manage plaintiff's anxiety while she tried to quit smoking.  *Id*.  Dr. Yu noted that plaintiff was taking medication to manage asthma symptoms.  *Id*.  Plaintiff continued to visit Dr. Yu for a variety of issues during 2004, and in November, Dr. Yu prescribed Prozac to help plaintiff deal with symptoms of depression and anxiety.  (T. 228).  However, plaintiff reported that the Prozac did not help.  (T. 228).  Plaintiff continued to smoke approximately a pack of cigarettes per day.  *Id*.

---

[5] It is unclear from the record whether plaintiff began physical therapy in August or September 2007.

9

Dr. Yu saw plaintiff in April 2005 due to an upper respiratory infection.  (T.
226).  Plaintiff had previously received a prescription for Augmentin, but had only
taken it for two days because she stated that she not getting better.  *Id*.  Dr. Yu
instructed plaintiff to continue taking Augmentin.  *Id*.  Dr. Yu also stated that plaintiff
had been prescribed 50 mg of Levoxyl daily for her Hypothyroidism, however, she
increased the dosage on her own to 100 mg daily.  *Id*.  Recent thyroid tests were
within the normal range.

In January 2006, after she coughed up a small amount of blood, plaintiff began
seeing pulmonologist, Dr. Zia Shah.  (T. 197).  Dr. Shah noted that plaintiff was using
medications and oxygen to manage her asthma.  (T. 187).  Later that month, Dr. Shah
performed a bronchoscopy.  (T. 187).  The bronchoscopy report stated that the vocal
cord looked normal, the trachea and rest of the mucosa were mildly inflamed, but there
were no secretions and no endobronchial disease.  *Id*.  When plaintiff returned for a
follow-up visit on February 7, 2006, Dr. Shah stated that plaintiff had moderately
severe emphysema.  (T. 193–94).  Dr. Shah also instructed plaintiff to stop smoking.
*Id*.

On February 15, 2006, plaintiff requested an "urgent" office visit with Dr. Yu.
(T. 219).  She had been having back pain for approximately four days, and it was
getting worse, with muscle spasm.  (T. 219).  Plaintiff went to a walk-in clinic where
she was diagnosed with a urinary tract infection and lower back pain.  *Id*.  The clinic
doctor prescribed a muscle relaxer, which she was unable to afford.  Dr. Yu found no
evidence of a urinary tract infection, but prescribed plaintiff a different a muscle

10

relaxer, to help with back pain because she could not afford the medication prescribed at the clinic.  *Id*.

On April 9, 2006, plaintiff went to the emergency room, complaining of chest pain radiating to her left arm and left shoulder.  (T. 217).  The next day, she saw Dr. Yu, and he reassured her that the pain was not of cardiac origin, but was most likely due to severe heartburn.  *Id*.  Following plaintiff's hospital visit, Dr. Yu gave plaintiff a sample of Protonix to resolve lingering heartburn symptoms, with instructions to take 20 mg of Prilosec daily when her symptoms subsided.  *Id*.  On March 14, 2007, plaintiff told Dr. Yu that Dr. Brosnan had not given her any medication for her back pain, and that she wanted to try something stronger than Vicodin because she was allergic to Vicodin.  (T. 216).  Dr. Yu prescribed Darvocet for plaintiff.  *Id*.  Plaintiff continued to smoke despite Dr. Yu's recommendations that she stop.  *Id*.

## V.   TESTIMONY and NON-MEDICAL EVIDENCE

Born on October 29, 1962, plaintiff was 46 years old at the time of the hearing on August 6, 2009.  (T. 24–25).  She testified that she was married and had two children.  (T. 27–28).  At that time, she lived with her husband, younger daughter, and nephew.  *Id*.  She completed school through 10th grade, and she earned her GED six years later.  (T. 26).  She took cosmetology classes in high school.  (T. 27).  She attended Bryant and Stratton Institute for one year, where she began, but did not complete, a course of study in accounting.  (T. 27).  She testified that she dropped out of the program to care for her sick brother.  *Id*.

Plaintiff suffered an injury in a fall at work on August 11 or 12, 1998,[6] while working for Temco, a janitorial service. (T. 137). She attempted to return to that company in 2000, but said she could not fulfill the job's requirements due to pain in her back and left knee. (T. 30–31). Prior to her injury, plaintiff worked at a McDonald's restaurant as a cashier and then as a waitress at the Green Owl restaurant. (T. 32). She also worked full-time as a taxi cab driver between 1996 and 1998. (T. 31–32). She stated she had been out of work since July of 2000.[7] (T. 29).

Plaintiff said that she was unable to fully bend her knee due to the pain, and as a result, her mobility was limited. (T. 37, 42–44). She also stated that she had asthma which caused her to become short of breath if she walked for more than half a block. (T. 37–38). She testified that her asthma had been getting worse prior to the hearing and prevented her from taking her daughter to amusement parks or going camping. (T. 40).

Plaintiff stated that she stayed on the first floor of her two bedroom house because it caused her too much pain to go up and down the stairs. (T. 28). She kept all of her belongings on the first floor and slept in her living room. (T. 27–28). On a typical day, plaintiff stated she would wake up between 7:30 and 8:00 am. (T. 47). She would take a hot shower before breakfast to relieve stiffness in her knee and back. (T. 48). She then woke her daughter up for school and tried to clean the house. *Id.*

---

[6] Some parts of the record indicate that plaintiff's injury occurred on August 11, 1998. (*See, e.g.,* T. 137). However, during the hearing, plaintiff stated the injury occurred on August 12, 1998. (T. 35). It is undisputed that plaintiff did in fact suffer an injury in August 1998.

[7] Plaintiff's medical records indicated that the last time she worked may actually have been April 1999. (T. 332).

12

She had trouble sweeping and mopping due to pain in her knee and back.  (T. 47).

She stated that she used to enjoy crocheting, but that the twisting motion involved in

working the hook and yarn hurt her back.  (T. 48)

She testified that her daughter and nephew helped her do the laundry at a

laundromat.  (T. 50).  Her husband did all of the shopping and cooking for the family.

(T. 49).  She said she did not do any outdoor work such as gardening or yard work.

*Id*.  Some days, she said, she would go to a friend's house to sit in the pool and chat.

*Id*.  She testified that she drove a car, but she did not go long distances because it was

painful for her to sit for more than 15 minutes.  (T. 49–50).

## VI.   ALJ'S DECISION

The ALJ found plaintiff had not engaged in substantial gainful activity since the

application date of March 14, 2007.  (T. 16).  The ALJ also found that plaintiff had

severe impairments: asthma and degenerative joint disease in her knee and back.  (T.

16).  The ALJ found that plaintiff did not have an impairment or combination of

impairments that met or medically equaled one of the impairments listed in 20 C.F.R.

Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 416.920(d), 416.925 and 416.926).  (T.

17).  The ALJ considered listings 1.02, 1.04 and 3.03, but found the plaintiff's

impairments did not meet the specific requirements of the listings.  *Id*.

After completing an analysis of plaintiff's RFC, the ALJ found that plaintiff

could perform sedentary work.  Specifically, he stated that she could "lift and/or carry

10 pounds occasionally; lift and/or carry less than 10 pounds frequently; stand and/or

walk 2 hours in an 8 hour workday; sit 6 hours in an 8 hour workday; occasionally

climb (ramps/stairs), balance, stoop and crouch; never kneel, crawl or work at heights; and she must always avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation and other respiratory irritants." (T. 17).  The ALJ further found that plaintiff had failed to produce "appropriate, probative evidence as required by the Social Security Act, Regulations and Rulings to substantiate her subjective allegations of disabling symptoms." (T. 20).  As a result, the ALJ found that plaintiff's claims as to her pain and other symptoms were not totally credible.  (T. 20).

The ALJ determined plaintiff had no past relevant work experience within the meaning of 20 C.F.R. § 416.965.  (T. 20).  After determining that plaintiff's non-exertional impairments would not significantly reduce the plaintiff's ability to do the full range of sedentary work, the ALJ used the Medical Vocational Guidelines, contained in 20 C.F.R. Part 404, Subpt. P, § 201.27 to find that plaintiff is not disabled, considering her age, education and prior work experience.  (T.  20–21).

## VII.  DISCUSSION

### A.   Treating Physician/Residual Functional Capacity (RFC)

#### 1.   Applicable Law

While a treating physician's opinion is not binding on the Commissioner, the opinion must be given controlling weight when it is well supported by medical findings and ***not inconsistent with other substantial evidence***.  *See Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002); 20 C.F.R. § 416.927(d).  If the treating physician's opinion is contradicted by other substantial evidence, the ALJ is ***not*** required to give the opinion controlling weight.  *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004).

14

The ALJ must, however, properly analyze the reasons that the report was rejected.  *Id.*
An ALJ may not arbitrarily substitute his own judgment for competent medical
opinion.  *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999).

In rendering a residual functional capacity (RFC) determination, the ALJ must
consider objective medical facts, diagnoses and medical opinions based on such facts,
as well as a plaintiff's subjective symptoms, including pain and descriptions of other
limitations.  20 C.F.R §§ 404.1545, 416.945.  *See Martone v. Apfel*, 70 F. Supp. 2d
145, 150 (N.D.N.Y. 1999) (citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y.
1990)).  An ALJ must specify the functions plaintiff is capable of performing, and
may not simply make conclusory statements regarding a plaintiff's capacities.
*Martone v. Apfel*, 70 F. Supp. 2d at 150 (citing *Ferraris v. Heckler*, 728 F.2d 582, 588
(2d Cir. 1984); *LaPorta v. Bowen*, 737 F. Supp. at 183; *Sullivan v. Secretary of HHS*,
666 F. Supp. 456, 460 (W.D.N.Y. 1987)).  The plaintiff's RFC can only be established
when there is substantial evidence of each physical requirement listed in the
regulations.  *Id.*

### 2.   Analysis

In this case, plaintiff argues that the ALJ's determination that plaintiff could
perform sedentary work was not supported by substantial evidence.  In making this
argument, plaintiff claims that the ALJ failed to give Dr. Brosnan's opinion sufficient
weight regarding the amount of time that plaintiff could sit, that the ALJ substituted
his own opinions for those of the medical experts, and that the ultimate RFC finding
was not supported by substantial evidence.  Thus, the court will discuss these claims

together.

The plaintiff argues that the ALJ erred in giving limited weight to the opinion of Dr. Brosnan, the treating physician, who treated the plaintiff for knee and back pain for approximately 10 years and saw plaintiff on a bi-monthly basis. *See* (T. 277–338). Actually, the ALJ gave ***all*** of Dr. Brosnan's opinions significant weight ***except*** one statement from his August 2009 RFC evaluation, indicating that plaintiff could not sit more than two hours during an eight hour work day. (T. 19). This RFC analysis appears in the "Medical Assessment of Ability to do Work-Related Activities (Physical)," a fill-in-the-blank form. (T. 345–49). When asked how much weight plaintiff could carry, Dr. Brosnan wrote "10." (T. 346). Dr. Brosnan also wrote that plaintiff could stand or walk two hours in an eight hour workday, and he checked boxes indicating that plaintiff could occasionally climb, balance, stoop, and crouch but never kneel or crawl. (T. 347).

The ALJ gave limited weight to Dr. Brosnan's limitation on plaintiff's ability to sit because it was inconsistent with Dr. Brosnan's other treatment notes. *Id*. In his decision, the ALJ specifically stated the reasons that he was rejecting Dr. Brosnan's statement regarding plaintiff's alleged inability to sit for more than two hours in an eight hour day. A review of Dr. Brosnan's treatment notes supports the ALJ's finding. In 1999, Dr. Brosnan wrote that plaintiff could perform a job, limited only by her inability to go up and down stairs. (T. 332). On May 24, 2000 and September 5,

16

2002, Dr. Brosnan stated that plaintiff "is capable of sedentary work."[8]  (T. 317, 323).

On September 16, 2005, after plaintiff's knee surgery, Dr. Brosnan stated that plaintiff

had lost only about 25% of the use of her knee.  (T. 302).

      The ALJ also noted his concern that Dr. Brosnan's estimate of plaintiff's ability

to sit was changed at plaintiff's "urging."  (T. 19).  The doctor's June 18, 2009 report

states that "[s]he asked me to amend her form, which I did.  She states she is able to sit

or stand for only 15 minutes at a time straight, for a total of about two hours a day for

each." (T. 355).  In addition to this concern, the ALJ found that Dr. Brosnan's opinion

regarding plaintiff's inability to sit more than two hours in a workday was inconsistent

with other medical evidence in the record.  (T. 19).  On January 10, 2005, Dr. Gerald

Coniglio[9] stated that plaintiff's prognosis was "poor" because her "subjective

symptom [sic] far outweigh her objective findings," and that the "best treatment for

her would be to find a job and return to work . . . ."  (T. 158).  On June 27, 2005, Dr.

Coniglio wrote that plaintiff "had only minimal discomfort in her knee" and that there

was "no objective evidence that would support a level of disability at this time."  (T.

151).

      On November 10, 2006, Dr. Barry Katzman, an orthopedic surgeon, considered

---

    [8] Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like small tools or ledgers and walking or standing are required only occasionally.  20 C.F.R. § 404.1567(a)

    [9] Dr. Coniglio, Dr. Katzman, and Dr. Naughten all examined plaintiff as part of independent medical exams for a variety of reasons.  (T. 151, 157, 235).

plaintiff's impairments and wrote that plaintiff could return to work that did not involve significant walking.  (T. 235).  He specifically stated that plaintiff "is not working at the time of this examination, but from an orthopedic perspective, the claimant could return to work with no significant walking."  *Id.*  In a consultative examination report, dated April 13, 2007, Dr. James Naughten stated that plaintiff would have no limitations sitting or standing.  (T. 240).

No other examining physicians in this case indicated that the plaintiff had difficulty sitting.  *See Dumas v. Schweiker*, 712 F.2d 1545, 1553 (2d Cir. 1983) (The secretary is entitled to rely not only on what the record says, but also on what it does not say).  The record is clear that the plaintiff has some difficulty walking.  (T. 332).  However, extensive walking is not required for sedentary work.  A report from Dr. S. Putcha,[10] a State agency medical consultant, also supports the finding that the plaintiff had the RFC to perform sedentary work.  (T. 243).  The ALJ's RFC findings were supported by substantial medical evidence in the record.   Due to the inconsistencies discussed above, this court finds that the ALJ properly analyzed the evidence and applied the treating physician rule in rejecting Dr. Brosnan's inconsistent statement regarding plaintiff's inability to sit for longer than fifteen minutes at a time.

---

[10] Although Dr. Putcha did not examine plaintiff, her opinion is consistent with other examining physicians' determinations that plaintiff could perform sedentary work.

### C.     Vocational Expert

#### 1.     Applicable Law

Because the plaintiff had no previous work experience, the ALJ proceeded to

Step 5 of the Commissioner's sequential analysis.  In meeting the Commissioner's

burden at Step 5, he may, under the appropriate circumstances, rely on the "Medical-

Vocational Guidelines," contained in 20 C.F.R. Part 404, Subpt. P, App. 2, known as

"The Grids." *Zorilla v. Chater*, 915 F. Supp. 662, 667 (S.D.N.Y. 1996) (footnotes

omitted).  The Grids classify work into five exertional categories, from sedentary to

very heavy, based upon physical abilities and strength. *Id.* at 667 n.2. *See* 20 C.F.R.

§ 404.1567(a).  Each exertional category has its own Grid, which then takes into

account the plaintiff's age, education, and prior work experience, yielding a decision

of "disabled" or "not disabled" when the plaintiff's particular characteristics are

inserted into the Grid categories.  20 C.F.R. Pt. 404, Subpt. P, App. 2 § 200.00(a) & §

404.1569.

The Grids focus on plaintiff's exertional impairments.  If a plaintiff has non-

exertional impairments in addition to her exertional impairments, and if those non-

exertional impairments "significantly limit the range of work" permitted by her

exertional impairment(s), the ALJ may not use the Grids exclusively and **may** be

required to consult a vocational expert (VE). *Bapp v. Bowen*, 802 F.2d 601, 606 (2d

Cir. 1986). "The mere existence of a non-exertional impairment, however, does not

automatically require the production of a vocational expert nor preclude reliance on the guidelines." *Id.* at 603.  Application of the Grids "and the necessity for expert testimony must be determined on a case-by-case basis." *Id*. at 605.  A non-exertional impairment is significantly limiting when it diminishes a person's "ability to work over and above any incapacity caused solely from exertional limitations—so that he is unable to perform the full range of employment indicated by the medical vocational guidelines." *Id.* at 603.  In contrast, non-exertional impairments that cause "negligible reductions in work capacity" will not invalidate the use of the Grids or require the ALJ to consult a VE.  *Id*. at 606 n.1.

### 2.    Analysis

Plaintiff argues that, because the ALJ found she had the non-exertional impairments of asthma and postural limitations, the ALJ had an obligation to obtain the opinion of a vocational expert.  (Pl.'s Mem. 15, 20).  In his decision, the ALJ stated that plaintiff's asthma would prevent her from working around respiratory irritants, and that the postural limitations prevented the plaintiff from climbing, balancing, kneeling, crouching, and crawling.[11]  (T. 20).

The ALJ found that plaintiff's non-exertional impairments were not significant, because sedentary work is usually performed in an office away from respiratory

---

[11] This court notes that plaintiff does not challenge the ALJ's findings as to what the non-exertional impairments were; she argues only that the ALJ had to consult a vocational expert after finding that plaintiff suffered from *any* non-exertional impairments.  (Pl.'s Mem. 15).  As stated above, this is an incorrect interpretation of the rule.

irritants and does not require climbing or crawling.  (T. 20–21).  The ALJ concluded that plaintiff's non-exertional impairments did not significantly diminish her ability to do the full range of sedentary work.  (T. 21).  He  permissibly relied upon the Grids in making his determination that plaintiff was not disabled.  *See e.g. Calabrese v. Astrue*, 358 Fed. Appx. 274, (2d Cir. 2009) (internal citations and quotations omitted) ("In light of the ALJ's ultimate finding that [plaintiff's] additional non-exertional limitations had little or no effect on her occupational base of unskilled sedentary work, the ALJ did not err in using the grids to determine [plaintiff's] disability status.").

The ALJ properly applied the correct legal standards, and his findings were supported by substantial evidence from the record.

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that the decision of the Commissioner be **AFFIRMED**, and plaintiff's complaint be **DISMISSED**.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have 14 days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN 14 DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated: July 14, 2011

**Hon. Andrew T. Baxter**
**U.S.  Magistrate Judge**